FILED
2026 Sep-01 AM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **VICTORIA REYES** and **ANGEL RODRIGUEZ**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**AESTO, LLC D/B/A AESTO HEALTH** and **VILLAGE PRACTICE MANAGEMENT COMPANY, LLC D/B/A VILLAGEMD**,<br><br>Defendants. | Case No. ________________<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Victoria Reyes and Angel Rodriguez ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Aesto, LLC d/b/a Aesto Health ("Aesto") and Village Practice Management Company, LLC d/b/a VillageMD (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Defendant Aesto is a healthcare software and data management firm based in Birmingham, Alabama.[1]

3. More specifically, Aesto "provides healthcare data migration and archiving services for its Covered Entity clients."[2]

4. Defendant Village Practice Management Company, LLC d/b/a VillageMD is a healthcare provider and client of Aesto. Thus, Defendant Village Practice Management Company, LLC d/b/a VillageMD uses the software and data services of Aesto and is thus a "Covered Entity."

5. As such, Defendants store a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "Private Information"—about their current and former patients. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

6. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants

---

[1] *Home Page*, AESTO HEALTH, https://www.aestohealth.com/ (last visited July 31, 2026).
[2] *Notice of Data Security Incident*, AESTO HEALTH (June 24, 2026) https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/.

had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their current and former patients' Private Information.

7. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendants' failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

8. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

9. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this data breach, their current and former patients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10. Plaintiff Victoria Reyes is a natural person and a citizen of Dorchester, Massachusetts. She is domiciled in Massachusetts (where she intends to remain).

11. Plaintiff Angel Rodriguez is a natural person and a citizen of Boston, Massachusetts. He is domiciled in Massachusetts (where he/e intends to remain).

12. Defendant Aesto, LLC d/b/a Aesto Health ("Aesto") is a limited liability company formed under the laws of Delaware and with its principal place of business at 1800 International Park Drive, Suite 110, Birmingham, Alabama 35243 .

13. Defendant Village Practice Management Company, LLC d/b/a VillageMD is a limited liability company formed under the laws of Delaware and with its principal place of business at 1 Diamond Hill Road, Berkeley Heights, New Jersey 07922.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members.

a. Under the Class Action Fairness Act, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10); *see also Alvarez v. Loancare LLC*, No. 20-21837-CIV, 2021 U.S. Dist. LEXIS 9281, at *20-21 (S.D. Fla. Jan. 19, 2021) (explaining that "limited liability companies are treated as unincorporated

associations for jurisdictional purposes . . . [and] for the CAFA's jurisdictional purposes, an unincorporated association is a citizen of the state in which it is organized and the state of its principal place of business").

b. Thus, Aesto is a citizen of Delaware (state of formation) and Alabama (principal place of business). Notably, the Data Breach impacted at least 37,253 people in Washington,[3] at least 730 people in Oregon,[4] and at least 91 people in Vermont.[5] Thus, Aesto is diverse from these Class Members which satisfies minimal diversity.

15. This Court has personal jurisdiction over Defendants because Aesto is headquartered in Alabama, and because both Defendants regularly conduct business in Alabama and/or have sufficient minimum contacts in Alabama.

16. Venue is proper in this Court because Aesto's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

---

[3] *Aesto, LLC*, WASH. ATTY GEN (Aug. 4, 2026) https://www.atg.wa.gov/aesto-llc.
[4] *Search Data Breaches*, OREGON (Aug. 5, 2026) https://justice.oregon.gov/consumer/databreach/.
[5] *Security Breach Notices*, VERMONT ATTY GEN (July 31, 2026), https://ago.vermont.gov/categories/security-breach-notices.

## BACKGROUND

***Defendants Collected and Stored the Private Information of Plaintiffs and the Class***

17. As part of their businesses, Defendants receive and maintain the Private Information of thousands of their current and former patients (i.e., the "Class" or "Class Members").

18. In collecting and maintaining the Private Information, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their Private Information.

19. Under state and federal law, businesses like Defendants have duties to protect their current and former patients' Private Information and to notify them about breaches.

20. Aesto recognizes these duties, advertising in its "Aesto Health Trust Center" that:

a. "Our commitment to data privacy and security is embedded in every part of our business."[6]

---

[6] *Aesto Health Trust Center*, AESTO HEALTH, https://trust.aestohealth.com/ (last visited Aug. 19, 2026).

b. "We have secure, reliable hosting that customers can depend on."[7]

c. "We pay great attention to enterprise features such as access control and single sign on."[8]

d. "We follow industry best practices for data security."[9]

e. "We take application security seriously and are putting together a program to monitor internal apps."[10]

f. "We take great care to work with best-in-class infrastructure providers that provide secure computing and storage."[11]

g. "We follow industry best practices for endpoint security."[12]

h. "We implement internal measures and practices to maintain a high standard of security."[13]

i. "We have a dedicated team that manages security risks."[14]

j. "We have strict asset management policies in place to ensure that all assets are accounted for and secure."[15]

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

k. "We provide security awareness training to all employees to ensure that they are aware of security best practices."[16]

l. "We have a change and configuration management process in place to ensure that changes are properly reviewed and approved."[17]

m. "We have physical and environmental controls in place to ensure that our data centers are secure and reliable."[18]

n. "We continuously monitor our systems for security threats and vulnerabilities."[19]

21. Aesto also advertises that it is "HITRUST" certified and "SOC 2 Type 2" compliant.[20]

22. On its home page, Aesto also declares that: "Aesto Health is committed to the highest standards of data security and compliance in healthcare" and "Aesto Health meets the security and compliance standards that healthcare organizations require."[21]

23. Similarly, Aesto advertises in its "Privacy Policy" that:

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Home Page*, AESTO HEALTH, https://www.aestohealth.com/ (last visited Aug. 19, 2026).

a. "Aesto Health values your privacy and is committed to protecting the personal information of our users, customers, and partners."[22]

b. "This Privacy Notice outlines how we collect, use, store, and share your information when you engage with our services, including visiting our website, using our applications, or interacting with us in business transactions."[23]

c. "Aesto Health may collect the following types of personal and non-personal information: . . Name Email Address Job Title Billing Address Phone Number[.]"[24]

d. "“We process your information for the following purposes: Providing and improving our services Conducting business transactions, marketing, and customer support Ensuring security and fraud prevention[.]"[25]

e. "Aesto Health may process Protected Health Information (PHI) as part of the services it provides to its customers . . . PHI is

---

[22] *Privacy Policy*, AESTO HEALTH, https://www.aestohealth.com/privacy-policy/ (last visited Aug. 19, 2026).
[23] *Id*.
[24] *Id*.
[25] *Id*.

processed solely on behalf of customers (Covered Entities) in accordance with applicable HIPAA requirements[.]"[26]

f. "Aesto Health does not sell, trade, or provide your personal information to unauthorized third parties."[27]

g. "We employ industry-standard technical and organizational measures to safeguard your personal information, including: Secure data encryption Access controls and authentication measures Regular security audits and compliance reviews Information collected through Aesto Health's website is processed and stored within secure cloud environments, including infrastructure located in the United States."[28]

h. "Aesto Health implements appropriate safeguards to protect data in accordance with applicable legal and regulatory requirements."[29]

i. "Aesto Health retains personal information only as long as necessary . . . When personal information is no longer required, it is securely deleted, anonymized, or otherwise disposed of in

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

accordance with Aesto Health's data retention and disposal policies."[30]

***Defendants' Data Breach***

24. From December 2, 2025, through December 18, 2025, Defendants were hacked in the Data Breach.[31]

25. Thus far, Aesto has confirmed in its "Notice of Data Security Incident" that:

a. "Aesto provides healthcare data migration and archiving services for its Covered Entity clients."[32]

b. "On or about December 18, 2025, Aesto experienced a network security incident that impacted a limited portion of our Amazon Web Services infrastructure."[33]

c. "[W]e confirmed that between on or about December 2, 2025, and December 18, 2025, certain protected health information belonging to patients of various Covered Entity clients stored within Aesto's network may have been accessed and/or acquired by an unauthorized actor."[34]

---

[30] *Id.*
[31] *Notice of Data Security Incident*, AESTO HEALTH (June 24, 2026) https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/.
[32] *Id.*
[33] *Id.*
[34] *Id.*

d. "The information included full names, full names, dates of birth, medical information, driver's license numbers, financial account numbers only, health insurance information, individual taxpayer identification numbers, other government identification numbers, and Social Security numbers."[35]

26. Defendant Village Practice Management Company, LLC d/b/a VillageMD has confirmed that it was impacted by the Data Breach in an official disclosure to the New Hampshire Attorney General.[36] Therein, Village Practice Management Company, LLC d/b/a VillageMD confirmed that "[b]ased on the list provided by Aesto, the names and Social Security numbers were involved in the incident for 107,349 [] patients."[37]

27. Notably, in a disclosure to the Washington Attorney General, Aesto confirmed that "data ***was taken*** between December 2, 2025 and December 18, 2025."[38]

28. Similarly, the entity "Tapestry 360 Health" reported in an official disclosure to the New Hampshire Attorney General that it was impacted by the Data

---

[35] *Id.*
[36] *Third-Party Vendor Data Security Incident Notification*, NEW HAMPSHIRE ATTY GEN (July 31, 2026) https://mm.nh.gov/files/uploads/doj/remote-docs/village-practice-management-20260731.pdf.
[37] *Id.*
[38] *Appendix*, WASH. ATTY GEN (July 31, 2026) https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA42089.pdf (emphasis added).

Breach and that: "After an extensive forensic investigation and manual document review, on May 26, 2026, Aesto confirmed that between on or about December 2, 2025, and December 18, 2025, certain data stored on a limited portion of Aesto's network ***was copied*** by an unauthorized actor."[39]

29. Likewise, in a disclosure to New Hampshire Attorney General, Aesto itself attested that "Aesto confirmed that between on or about December 2, 2025, and December 18, 2025, a limited amount of your protected health information . . . which was stored Aesto's network, ***was copied*** by an unauthorized actor."[40]

30. As of August 18, 2026, Aesto has confirmed that at least the following entities (the "Covered Entities") were impacted by the Data Breach:

a. Ninilchik Traditional Council Community Clinics;

b. My Doctor, LLC;

c. Sterling Health Solutions;

d. Henry County Hospital;

e. Midtown Community Health Center;

f. Little River Memorial Hospital;

---

[39] *Notice of Data Event*, NEW HAMPSHIRE ATTY GEN (Aug. 12, 2026) https://mm.nh.gov/files/uploads/doj/remote-docs/tapestry-360-health-20260812.pdf (emphasis added).

[40] *Notice of Data Event*, NEW HAMPSHIRE ATTY GEN (Aug. 11, 2026) https://mm.nh.gov/files/uploads/doj/remote-docs/shenandoah-valley-medical-system-20260811.pdf (emphasis added)

g. Graham County Hospital;

h. Missoula Community Health Services Inc., dba Mineral Community Hospital;

i. Monroe Health Center;

j. Mid-South OB-GYN, PLLC;

k. Women's Health Associates, Inc.;

l. Together Women's Health Medical Group of Alabama, PC;

m. Together Women's Health Medical Group, PC;

n. Effingham Obstetrics & Gynecology Associates, PLLC;

o. Main Street Medical Services, PLLC;

p. Rural Health Resources of Jackson County Inc. d/b/a Holton Community Hospital;

q. Park West Health Systems, Inc.;

r. Marana Health;

s. Greenwood County Hospital;

t. Gila Health Resources, LLC;

u. Edwards County Medical Center;

v. Ellenville Regional Hospital;

w. Shenandoah Valley Medical System Inc.;

x. Texas Spine Consultants, LLP; and

y. Nebraska Orthopedic Center, P.C.[41]

31. However, this list of Covered Entities is preliminary. And on information and belief, the Data Breach impacted other healthcare entities besides those identified so far. For example, the Internet Archive shows that Aesto did not mention "Ninilchik Traditional Council Community Clinics" as of August 6, 2026.[42] But Aesto then updated its webpage to include "Ninilchik Traditional Council Community Clinics" by August 18, 2026.[43]

32. Additionally, Aesto reported to the Washington Attorney General that "Grant County Public Hospital District #2" was among the exposed entities.[44] But as of August 18. 2026, Aesto has not included "Grant County Public Hospital District" in the list of impacted entities on its official website.[45]

---

[41] *Notice of Data Security Incident COVERED ENTITIES IDENTIFIED*, AESTO HEALTH (Aug. 18, 2026) https://www.aestohealth.com/covered-entity-notice-of-data-security-incident-12-18-25/.

[42] *See Notice of Data Security Incident COVERED ENTITIES IDENTIFIED*, AESTO HEALTH (Aug. 6, 2026) https://web.archive.org/web/20260807225909/https://www.aestohealth.com/covered-entity-notice-of-data-security-incident-12-18-25/.

[43] *Notice of Data Security Incident COVERED ENTITIES IDENTIFIED*, AESTO HEALTH (Aug. 18, 2026) https://www.aestohealth.com/covered-entity-notice-of-data-security-incident-12-18-25/.

[44] *Data Breach Notice*, WASH. ATTY GEN (June 26, 2026) https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA42154.pdf.

[45] *See Notice of Data Security Incident COVERED ENTITIES IDENTIFIED*, AESTO HEALTH (Aug. 18, 2026) https://www.aestohealth.com/covered-entity-notice-of-data-security-incident-12-18-25/.

33. Similarly, Aesto reported to the Washington Attorney General that "Everside Health" was among the exposed entities.[46] But as of August 18. 2026, Aesto has not included "Everside Health" in the list of impacted entities on its official website.[47]

34. Moreover, Aesto advertises on its website that its clients also include: Athena Health, PointClickCare, United Urology Group, Valley Dental Care, Unified Womens Healthcare, and Family Medicine Associates of Texas.[48]

35. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendants' custody and control.

36. Thus far, Aesto has reported to the Washington Attorney General that 37,253 people in Washington were exposed during the Data Breach and that the compromised Private Information included " Name; Social Security Number; Driver's License or Washington ID Card Number; Financial & Banking Information; Full Date of Birth; Medical Information; Protected Health Information owned or licensed by a HIPAA covered entity[.]"[49]

---

[46] *Appendix*, WASH. ATTY GEN (July 31, 2026) https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA42089.pdf.
[47] *See Notice of Data Security Incident COVERED ENTITIES IDENTIFIED*, AESTO HEALTH (Aug. 18, 2026) https://www.aestohealth.com/covered-entity-notice-of-data-security-incident-12-18-25/.
[48] *Who we help*, AESTO HEALTH, https://www.aestohealth.com/who-we-help/ (last visited Aug. 19, 2026).
[49] *Aesto, LLC*, WASH. ATTY GEN (Aug. 4, 2026) https://www.atg.wa.gov/aesto-llc.

37. And yet, Defendants waited over until June 24, 2026, before they began notifying the class—a ***full 204 days*** after the Data Breach began.[50]

38. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

39. And when Defendants did notify Plaintiffs and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

a. "If you are very concerned about becoming a victim of fraud or identity theft, you may request a 'Security Freeze' be placed on your credit file[.]"[51]

b. "Review your 'explanation of benefits statement,' which you receive from your health insurance company."[52]

c. "Follow up with your insurance company or care provider for any items you do not recognize. If necessary, contact the care provider on the explanation of benefits statement and ask for

[50] *Notice of Data Security Incident*, AESTO HEALTH (June 24, 2026) https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/.
[51] *Notice of Data Security Incident*, AESTO HEALTH (June 24, 2026) https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/.
[52] *Id*.

copies of medical records from the date of the potential access (noted above) to current date."[53]

d. "Ask your insurance company for a current year-to-date report of all services paid for you as a beneficiary. Follow up with your insurance company or the care provider for any items you do not recognize."[54]

e. "Additionally, you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis."[55]

f. "[W]e are also suggesting steps you can take to protect your medical information[.]"[56]

g. "[B]e vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."

h. "If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you

---

[53] *Id.*
[54] *Id.*
[55] *Appendix*, WASH. ATTY GEN (July 31, 2026) https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachA42089.pdf.
[56] *Id.*

> should immediately contact the Federal Trade Commission and/or the Attorney General's office in your state."[57]

40. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information. And thus, Defendants caused widespread injury and damages.

41. Since the breach, Aesto claims that "Aesto continually evaluates and modifies its practices to enhance the security and privacy of the personal information it maintains."[58] But such simple declarations are insufficient to ensure that the Private Information in question will be protected from additional exposure in a subsequent data breach.

42. Defendants have done little to remedy their Data Breach. True, Defendants have offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendants inflicted upon them.

43. Because of Defendants' Data Breach, the sensitive Private Information of Plaintiffs and Class Members was placed into the hands of cybercriminals—

---

[57] *Id.*
[58] *Notice of Data Security Incident*, AESTO HEALTH (June 24, 2026) https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/.

inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

44. Stunningly, this Data Breach is only part and parcel of Aesto's ***pattern*** of negligent data security. And in 2022, Aesto experienced another data breach that exposed healthcare data whereby "an unauthorized actor had accessed Aesto Health's systems between December 25 and March 8" and the "unauthorized actor also copied some files from a backup storage device, including [] radiology reports."[59] In total, that data breach impacted approximately 17,400 people.[60] Thus, Aesto knew of the importance of proper cybersecurity and the risks of data breaches by cybercriminals. Thus, the Data Breach was foreseeable to Aesto.

45. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[61]

---

[59] Jill Hughes, *Aesto Health, Aon PLC, Alameda Health System Suffer Healthcare Data Breaches*, TECH TARGET (June 10, 2022) https://www.techtarget.com/healthtechsecurity/news/366594775/Aesto-Health-Aon-PLC-Alameda-Health-System-Suffer-Healthcare-Data-Breaches; *see also* Steve Adler, *Data Breaches Reported by Aesto Health and Motion Picture Industry Health Plan*, THE HIPAA JOURNAL (June 9, 2022) https://www.hipaajournal.com/data-breaches-reported-by-aesto-health-and-motion-picture-industry-health-plan/.

[60] Steve Adler, *May 2022 Healthcare Data Breach Report*, THE HIPAA JOURNAL (June 21, 2022) https://www.hipaajournal.com/may-2022-healthcare-data-breach-report/.

[61] Brenda Robb, *After the Data Breach – What Happens to Your Data*, BLACKFOG (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

46. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[62]

47. Thus, on information and belief, the Private Information of Plaintiffs and the Class has already been leaked or sold by cybercriminals on the Dark Web or will be leaked or sold imminently by cybercriminals on the Dark Web.

***Plaintiff Victoria Reyes's Experiences and Injuries***

48. Plaintiff Victoria Reyes is a patient of a Covered Entity that provided her Private Information to Aesto. Specifically, Plaintiff is a patient of Village Practice Management Company, LLC d/b/a VillageMD.

49. Thus, Defendants obtained and maintained Plaintiff's Private Information.

50. As a result, Plaintiff was injured by Defendants' Data Breach.

51. Plaintiff is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. She is careful to store any documents containing her Private Information in a secure location.

---

[62] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

52. Plaintiff (and/or her third-party agent) provided her Private Information to Defendants and trusted Defendants would use reasonable measures to protect they according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

53. Plaintiff (and/or her third-party agent) reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

54. Thus, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

55. Through their Data Breach, Defendants compromised Plaintiff's Private Information.

56. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. To mitigate the risks created by the Data Breach, Plaintiff has lost approximately thirty (30) minutes researching the Data Breach and calling the Data Breach hotline.

57. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls.

58. Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

59. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

60. Plaintiff suffered actual injury from the exposure and theft of her Private Information—which violates her rights to privacy.

61. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect.

62. As a patient, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff (and/or her third-party agent) paid Defendants for medical services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants was transparent about its deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced its prices to account for the deficient data security.

63. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's Private Information right in the hands of criminals.

64. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

65. Today, Plaintiff has a continuing interest in ensuring that her Private Information—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Angel Rodriguez's Experiences and Injuries***

66. Plaintiff Angel Rodriguez is a patient of a Covered Entity that provided his Private Information to Aesto. Specifically, Plaintiff is a patient of Village Practice Management Company, LLC d/b/a VillageMD.

67. Thus, Defendants obtained and maintained Plaintiff's Private Information.

68. As a result, Plaintiff was injured by Defendants' Data Breach.

69. Plaintiff is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. He is careful to store any documents containing his Private Information in a secure location.

70. Plaintiff (and/or his third-party agent) provided his Private Information to Defendants and trusted Defendants would use reasonable measures to protect they according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continue to maintain Plaintiff's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

71. Plaintiff (and/or his third-party agent) reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

72. Thus, on information and belief, Plaintiff's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

73. Through their Data Breach, Defendants compromised Plaintiff's Private Information.

74. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. To mitigate the risks created by the Data Breach, Plaintiff has lost approximately thirty (30) minutes researching the Data Breach and calling the Data Breach hotline.

75. And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam emails, text messages and phone calls.

76. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

77. Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

78. Plaintiff suffered actual injury from the exposure and theft of his Private Information—which violates his rights to privacy.

79. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants was required to adequately protect.

80. As a patient, Plaintiff suffered actual injury and lost the "benefit of the bargain" because Plaintiff (and/or his third-party agent) paid Defendants for medical services and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants was transparent about its deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor of Defendants, or (2) would have become a customer Defendants only if Defendants reduced its prices to account for the deficient data security.

81. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's Private Information right in the hands of criminals.

82. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

83. Today, Plaintiff has a continuing interest in ensuring that his Private Information—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

84. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[63] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with

[63] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[64]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[65]

c. 89% of consumers stated that "I care about data privacy."[66]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[67]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[68]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[69]

***Plaintiffs and the Proposed Class Suffered Common Injuries and Damages***

85. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These

[64] *Id*. at 3.
[65] *Id*.
[66] *Id*. at 9.
[67] *Id*.
[68] *Id*.
[69] *Id*. at 11.

damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the Private Information.

***Substantially Increased Risk of Identity Theft and Fraud***

86. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

87. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

88. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

89. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

90. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[70] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[71] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

91. The unencrypted Private Information of Plaintiffs and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

92. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse

---

[70] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).
[71] *Id*.

of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

93. In particular, the theft of Social Security numbers—in combination with other Private Information (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

94. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that person."[72] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[73]

95. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

---

[72] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[73] *Id.*

Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

96. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[74]

97. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

98. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

99. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses

[74] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

100. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[75]

101. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[76] These dossiers are both shockingly accurate and

[75] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[76] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials

comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

102. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members'

---

associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

103. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[77]

104. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

105. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[77] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

106. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

107. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

108. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

109. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[78]

110. Indeed, cyberattacks have become so notorious that the Federal Bureau

---

[78] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[79]

111. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[80]

112. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Could Have Prevented the Data Breach***

113. Data breaches are preventable.[81] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

---

[79] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[80] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Sept. 11, 2023).

[81] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[82]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[83]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [84]

***Defendants Failed to Follow FTC Guidelines***

114. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

[82] *Id.* at 17.
[83] *Id.* at 28.
[84] *Id.*

115. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[85] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

116. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

117. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

[85] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

118. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

119. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

120. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data

unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

121. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

122. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

123. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

***Defendants Violated HIPAA***

124. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[86]

125. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information and PHI is properly maintained.[87]

126. The Data Breach resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

[86] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[87] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable,

harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

127. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

128. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class against Aesto, LLC d/b/a Aesto Health (the "Aesto Class"):

> All individuals residing in the United States, except those individuals residing in Alabama, whose Private Information was compromised in the Data Breach that

> impacted Aesto in December 2025, including all those individuals who received notice of the breach.

129. Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class against Village Practice Management Company, LLC d/b/a VillageMD (the "VillageMD Class"):

> All individuals residing in the United States whose Private Information was compromised in the Data Breach that impacted Aesto in December 2025, and who provided their Private Information to Village Practice Management Company, LLC d/b/a VillageMD, including all those individuals who received notice of the breach.

130. Together, the "Aesto Class" and the "VillageMD Class" are referred to herein as the "Class."

131. Excluded from the Class are Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

132. Plaintiffs reserve the right to amend the class definition.

133. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

134. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

135. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least one thousand members.

136. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

137. Adequacy. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

138. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Private Information;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing Private Information;

d. if Defendants breached contract promises to safeguard Plaintiffs and the Class's Private Information;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiffs and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

139. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual

litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

140. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

141. Plaintiffs and the Class (or their third-party agent healthcare provider) entrusted their Private Information to Defendants on the premise and with the understanding that Defendants would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

142. Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security

in accordance with industry standards for data security—would compromise their Private Information in a data breach. And here, that foreseeable danger came to pass.

143. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if their Private Information was wrongfully disclosed.

144. Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' Private Information.

145. Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Private Information in their care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their Private Information.

146. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

147. Defendants also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under applicable regulations.

148. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

149. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party

agent healthcare provider) entrusted Defendants with their confidential Private Information, a necessary part of obtaining services from Defendant.

150. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable. Given that Defendants hold vast amounts of Private Information, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the Private Information —whether by malware or otherwise.

151. Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

152. Defendants improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

153. Defendants breached these duties as evidenced by the Data Breach.

154. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' Private Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Private Information was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

155. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

156. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

157. Defendants have admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

158. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

159. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

160. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

161. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

162. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

163. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive Private Information.

164. Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

165. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

166. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures

and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

167. But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

168. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants was failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

169. Similarly, under HIPAA, Defendants had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

170. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

171. Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

172. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

173. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

174. Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

175. Plaintiffs and Class Members (or their third-party agent healthcare provider) were required to provide their Private Information to Defendants as a condition of receiving services provided by Defendants. Plaintiffs and Class Members (or their third-party agent healthcare provider) provided their Private Information to Defendants or their third-party agents in exchange for Defendants' services.

176. Plaintiffs and Class Members (or their third-party agent healthcare provider) reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

177. Plaintiffs and Class Members (or their third-party agent healthcare provider) reasonably understood that Defendants would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

178. Plaintiffs and the Class Members (or their third-party agent healthcare provider) accepted Defendants' offers by disclosing their Private Information to Defendants or their third-party agents in exchange for services.

179. In turn, and through internal policies, Defendants agreed to protect and not disclose the Private Information to unauthorized persons.

180. Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members (or their third-party agent healthcare provider) with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

181. After all, Plaintiffs and Class Members (or their third-party agent healthcare provider) would not have entrusted their Private Information to Defendants (or their third-party agent healthcare provider) in the absence of such an agreement with Defendant.

182. Plaintiffs and the Class (or their third-party agent healthcare provider) fully performed their obligations under the implied contracts with Defendant.

183. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

184. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

185. Defendants materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agent healthcare provider) by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendants created, received, maintained, and transmitted.

186. In these and other ways, Defendants violated their duty of good faith and fair dealing.

187. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

188. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

189. Plaintiffs and Class Members (or their third-party agent healthcare provider) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

190. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

191. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were

accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

192. Defendants owed a duty to their current and former patients, including Plaintiffs and the Class, to keep this information confidential.

193. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' Private Information is highly offensive to a reasonable person.

194. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agent healthcare provider) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

195. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

196. Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

197. Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

198. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

199. As a proximate result of Defendants' acts and omissions, the private and sensitive Private Information of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

200. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

201. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information are still maintained by Defendants with their inadequate cybersecurity system and policies.

202. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the Private Information of Plaintiffs and the Class.

203. In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

204. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

205. This claim is pleaded in the alternative to the breach of implied contract claim.

206. Plaintiffs and Class Members (or their third-party agent healthcare provider) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their Private Information to provide services, and (2) accepting payment.

207. Defendants appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

208. Plaintiffs and Class Members (or their third-party agent healthcare provider) reasonably understood that Defendants would use adequate cybersecurity measures to protect the Private Information that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

209. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

210. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

211. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) Private Information and (2) payment because Defendants failed to adequately protect their Private Information.

212. Plaintiffs and Class Members have no adequate remedy at law.

213. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**<u>SIXTH CAUSE OF ACTION</u>**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

214. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

215. Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

216. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their Private Information.

217. Because of the highly sensitive nature of the Private Information, Plaintiffs and Class Members (or their third-party agent healthcare provider) would not have entrusted Defendant, or anyone in Defendants' position, to retain their Private Information had they known the reality of Defendants' inadequate data security practices.

218. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' Private Information.

219. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

220. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## **SEVENTH CAUSE OF ACTION**
### **Declaratory Judgment**
### **(On Behalf of Plaintiffs and the Class)**

221. Plaintiffs incorporate by reference paragraphs 1–139 as if fully set forth herein.

222. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

223. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and *still* are—inadequate and

unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

224. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continues to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendants breaches of their duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

225. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

226. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experiences a second data breach.

227. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

228. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

229. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D. Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

Date: August 31, 2026

Respectfully submitted,

By: */s/ Jonathan S. Mann*

Jonathan S. Mann (ASB-1083-A36M)
Austin B. Whitten (ASB-K13Y-7228)
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Email: jonm@pittmandutton.com
Email: austinw@pittmandutton.com

*Attorneys for Plaintiffs and Proposed Class*